O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| RONALD KAMMEYER, and MURAL CONSERVANCY OF LOS ANGELES<br><br>PlaintiffS,<br><br>        v.<br><br>ONEIDA TOTAL INTEGRATED ENTERPRISES, UNITED STATES ARMY CORPS OF ENGINEERS, JOHN MCHUGH, THOMAS BOSTICK, JO-ELLEN DARCY, and KIMBERLY COLLOTON<br><br>Defendants. | Case No. EDCV 15-869-JGB (KKx)<br><br>**ORDER: GRANTING Plaintiff's Motion for Preliminary Injunction (Doc. No. 19.)**<br><br>**[Motion filed June 2, 2015]** |

On June 15, 2015, the Court granted a Temporary Restraining Order which enjoined Defendant United States Army Corps of Engineers ("USACE") from altering or destroying the Bicentennial Freedom Mural in Corona, California.  Now before the Court is Plaintiffs' Motion for a Preliminary Injunction.  The Court has considered all papers filed in support of and in opposition to the Application as well as the arguments presented at the

August 19, 2015 hearing.  For the reasons expressed below, the Court GRANTS the Motion.

## I.   BACKGROUND

Plaintiffs Ronald Kammeyer and the Mural Conservancy of Los Angeles ("Plaintiffs") seek to halt the destruction of the "Bicentennial Freedom Mural" (the "Mural") that is displayed on the spillway of the Prado Dam in Corona, California.

Plaintiffs filed their Complaint on May 4, 2015. (Doc. No. 1.)  On June 2, 2015, Plaintiffs filed a First Amended Complaint ("FAC") against Defendants USACE and Oneida Total Integrated Enterprises ("Oneida").  (Doc. No. 14.)  The FAC alleges that Plaintiff Kammeyer is an accomplished landscape architect who co-designed the Mural when he was in high school.  (FAC ¶ 4, 15.)  The Mural, which was painted by high school volunteers in 1976, is 640 feet long and 100 feet tall, and is visible to commuters passing by on the State Route 91 freeway. (Id. ¶¶ 17-18.)  Plaintiffs allege that Defendants plan to destroy the Mural, ostensibly due to concerns over graffiti and lead paint.  (Id. ¶ 21.)  Based on these allegation, Plaintiffs allege causes of action under: (1) the Visual Rights Act of 1990 ("VARA"), 17 U.S.C. § 101 et seq; (2) the California Art Preservation Act ("CAPA"),

California Civil Code § 987; (3) California Business & Professions Code § 17200.

**A. Motion for Preliminary Injunction**

On June 2, 2015, Plaintiffs filed their Motion for Preliminary Injunction. (Doc. No. 19.) USACE opposed on June 22, 2015. ("Opp'n," Doc. No. 27.) Plaintiffs replied on June 29, 2015. ("Reply," Doc. No. 29.)

In the preliminary injunction briefing, USACE explains that the Prado Dam and its spillway are part of a federal flood-risk-management project known as the Santa Ana River Mainstem Project ("SARM").[1] (Opp'n at 1.) The Prado Dam is located on federal lands that are within the jurisdiction of the L.A. District of USACE. (Id. at 2.) USACE explains that in August 2011, a SARM project manager requested that USACE perform a safety survey of the Mural; this request was prompted by concerns over the appearance of the Mural and the suspicion that it contained lead paint. (Declaration of Diane Rosenberg ("Rosenberg Decl."), Doc. No. 27-6, ¶ 3.) The Mural has become faded and chipped over the years, and has also been the target of graffiti. (Declaration

---

[1] SARM provides flood protection to the Santa Ana River Basin communities in Orange, Riverside, and San Bernardino counties. (Declaration of David Van Dorpe ("Van Dorpe Decl."), Doc. No. 27-5, ¶ 2.)

3

of David Van Dorpe ("Van Dorpe Decl."), Doc. No. 27-5, Ex. A.)  USACE has not maintained the Mural, as it asserts that its operations and maintenance budgets do not include the necessary funds.  (Declaration of Lillian Dampios ("Dampios Decl."), Doc. No. 27-8, ¶ 2.)

After USACE surveyed the Mural, it commissioned lead-paint testing.  (Van Dorpe Decl. ¶ 10.)  The report, finalized in May 2014, concluded that various paints on the spillway were either "lead-based" or "lead-containing."  (Rosenberg Decl., Ex. B.)  The report concluded that the paint should either be encapsulated (a process by which a sealant is applied over the paint) or removed so as to prevent lead paint from washing off the face of the spillway and being released into the environment.  (Id. at 4.)  In May 2014, a USACE project manager presented these conclusions to a USACE review board.  (Van Dorpe Decl. ¶¶ 11-12.)  The project manager believed that remediation was necessary, and presented cost estimates for encapsulation ($210,000.00) and full removal ($285,000.00).  (Id. ¶ 12.)  USACE leadership determined full removal was appropriate, given that (1) the estimated cost for encapsulation did not include future upkeep costs, which would likely make encapsulation more expensive than removal over the long term, and (2) future construction on the spillway was planned, which could lead to potential damage of the

4

encapsulation with resulting lead-paint exposure. (Rosenberg Decl. ¶ 17.)  USACE therefore solicited contracts for removal of the Mural, and ultimately awarded the job to Oneida.  (Van Dorpe Decl. ¶¶ 13-14.)

On July 25, 2014, USACE posted a Special Public Notice on one of its websites about the planned removal of the Mural.  (Declaration of Carvel Bass ("Bass Decl."), Doc. No. 27-3, ¶¶ 7-8.)  On April 9, 2015, a public meeting was held at Corona High School, and the general public was invited to speak or provide written comments on the Mural removal project and on the Mural itself.  (Van Dorpe Decl. ¶¶ 25-26.)  In February 2015, USACE held another meeting with local government and resource agencies, in which USACE presented further details about the Mural removal project.  (Van Dorpe Decl. ¶ 17.)  During the meeting, USACE informed these local agencies that it would seek a willing partner or partners to commit to re-painting the spillway with a new mural and maintaining that new mural in the future. (Id.)

**B. Supplemental Briefing**

After reviewing the parties' initial briefing on the preliminary injunction, the Court noted that Plaintiffs had shifted their focus to their third cause of action,

under which they asserted that USACE had not complied with its obligations under Section 106 of the National Historic Preservation Act ("NHPA").  Given the significance of the preliminary injunction decision, the Court concluded that fuller briefing on the issue was necessary.  Additionally, Plaintiffs had not pleaded their NHPA claim properly; rather than pleading it against USACE under the APA (as would have been proper), Plaintiffs pleaded it against Oneida under the UCL.  (See Doc. No. 35 at 2.)  The Court therefore issued an Order on July 9, 2015.  (Doc. No. 35.)  The Order granted Plaintiffs leave to file a Second Amended Complaint and requested additional briefing on the NHPA cause of action.  (Id. at 3.)

On July 17, 2015, Plaintiffs filed their Second Amended Complaint, which included a cause of action under the NHPA.  (Doc. No. 36.)  On July 31, 2015, Plaintiffs and USACE filed their supplemental briefing on the NHPA cause of action.  ("P. Supp. Brief," Doc. No. 39; "U. Supp. Brief," Doc. No. 37.)  On August 7, 2015, Plaintiffs and USACE filed their opposition supplemental briefs.  ("P. Supp. Opp'n," Doc. No. 43; "U. Supp. Opp'n," Doc. No. 44.)

1
2

## II.  LEGAL STANDARD[2]

3
4
5
6
7
8
9
10
11
12
13
14
15
16

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  "A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right."  Munaf v. Geren, 553 U.S. 674, 690 (2008) (citations omitted).  An injunction is binding only on parties to the action, their officers, agents, servants, employees and attorneys and those "in active concert or participation" with them.  Fed. R. Civ. P. 65(d).

17
18

## III. DISCUSSION

19
20
21
22
23
24

Plaintiffs seek a preliminary injunction that would enjoin USACE from "tak[ing] any action that could alter, desecrate, destroy or modify in any way" the Mural. Neither party disputes that absent an injunction, USACE will go ahead with its plans to remove the Mural.

25
26
27
28

---

[2] Unless otherwise noted, all mentions of "Rule" refer to the Federal Rules of Civil Procedure.

7

1    In contesting the Motion, USACE primarily focuses its

2 arguments on Plaintiffs' likelihood of success on the

3 merits.  However, before reaching the merits arguments,

4 the Court will first discuss the likelihood of

5 irreparable harm and the balance of equities.  This is

6 necessary because the Ninth Circuit has endorsed a

7 "sliding scale" test for preliminary injunctions.  As

8 stated by the Ninth Circuit: "[w]here the balance of

9 hardships tips sharply in the plaintiff's favor and the

10 plaintiff has demonstrated a likelihood of irreparable

11 harm, however, the plaintiff need only show that "serious

12 questions" exist as to success on the merits.

13 See Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127,

14 1131 (9th Cir. 2011).

15

16   **A. Likelihood of Irreparable Harm**

17

18    Given the facts of this case, the Court easily

19 concludes that Plaintiffs have shown a high likelihood of

20 irreparable harm: USACE intends to immediately remove the

21 Mural if not enjoined.  If the Mural is removed, it will

22 be destroyed and lost forever.  It is well established

23 that "[p]roperty is always unique under general

24 principles of the law of equity and its possible loss or

25 destruction usually constitutes irreparable harm."

26 Fisher v. Kealoha, No. CIV. 11-00589 ACK, 2012 WL

27 2526923, at *10 (D. Haw. June 29, 2012) (quoting Bennet

28

v. Dunn, 504 F. Supp. 981, 986 (D. Nev. 1980).  Moreover, the property at issue here is a unique work of public art with arguable historical significance.  The destruction of that art – which Defendants concede will occur absent an injunction – is clearly irreparable harm.

## B. The Balance of Equities

The Court next concludes that the balance of equities tips sharply in in Plaintiffs' favor.  If the Mural is destroyed Plaintiffs and the public will have no further recourse.  On the other hand, if the Court grants a preliminary injunction, USACE will only suffer some delay in their construction plans if it ultimately prevails. Moreover, it appears unlikely that USACE's plans to modify the Prado Dam will even need to be postponed at all.  USACE has conceded that the spillway is not scheduled to be raised until approximately 2019.  (Van Dorpe Decl. ¶ 6.)  It is highly unlikely that the proceedings in this lawsuit will last until then.  If USACE ultimately prevails, it will still have plenty of time to remove the Mural before construction on the spillway is set to begin.  Thus, any hardship to USACE is minimal.

1
2

**C. Likelihood of Success on the Merits**

3

4

   Given that Plaintiffs have shown both an immediate

5

threat of irreparable harm and that the balance of

6

equities tips sharply in their favor, they must only show

7

that "serious questions" exist as to their likelihood of

8

success on the merits.  See <u>Alliance for Wild Rockies</u>,

9

632 F.3d at 1131.  The Court will examine each of

10

Plaintiffs' three claims against USACE.

11

   **1. Visual Artists Rights Act of 1990**

12

13

      **a. Sovereign Immunity**

14

15

   USACE first argues that Plaintiffs' VARA claim is

16

barred by the doctrine of sovereign immunity.  The Court

17

disagrees.

18

19

   Under the doctrine of sovereign immunity, "it is

20

axiomatic that the United States may not be sued without

21

its consent and the existence of consent is a

22

prerequisite for jurisdiction."  <u>United States v.</u>

23

<u>Mitchell</u>, 463 U.S. 206, 212 (1983).  In order for waivers

24

of the government's sovereign immunity to be effective,

25

they must be "unequivocally expressed" by Congress.

26

<u>Lehman v. Nakshian</u>, 453 U.S. 156, 160–61 (1981).  The

27

same principles of sovereign immunity which would apply

28

to a suit against the United States apply to a suit against a government agency, because the United States is the real party in interest.  See Helash v. Ballard, 638 F.2d 74, 76 (9th Cir. 1980) (per curiam).

There are two Congressional waivers of sovereign immunity at play for purposes of this Motion,[3] the first of which is the Administrative Procedures Act ("APA"), 5 U.S.C. § 702.  The APA allows a "person suffering legal wrong because of agency action" to seek injunctive relief (but not money damages) in a suit against the United States.  5 U.S.C. § 702.

USACE does not dispute that the APA could apply to Plaintiffs' causes of action.  USACE, a government agency, has decided to take a course of action that Plaintiffs assert is unlawful under VARA.   The APA permits the Court to "hold unlawful and set aside agency action, findings and conclusions" that are "arbitrary, capricious . . . or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A)(emphasis added).  Therefore, the APA would, on its face, appear to apply to Plaintiffs' claims.

_____

[3] Plaintiffs also assert that they are entitled to money damages, which are allowed under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §1346(b).  (Motion at 14.) However, that issue is not germane to this Motion, as Plaintiffs only seek injunctive relief.

1    USACE contends that a closer reading of Section 702
2    shows that Plaintiffs may not pursue their VARA claim
3    under the APA.  Specifically, USACE points to Section
4    702(2), which explains that a court may not grant relief
5    under the APA "if any other statute that grants consent
6    to suit expressly or impliedly forbids the relief which
7    is sought."  5 U.S.C. § 702(2).  USACE argues that 28
8    U.S.C. § 1498(b) forbids the relief Plaintiffs seek.

10    Section 1498(b) is another Congressional waiver of
11   sovereign immunity.  The statute grants consent for the
12   United States to be sued for copyright infringement; yet,
13   it only allows monetary damages (not injunctive relief)
14   and requires that the claim be brought in the United
15   States Court of Claims.  28 U.S.C. § 1498(b).  Therefore,
16   if Section 1498(b) provided the jurisdictional basis for
17   Plaintiffs' VARA claim, it would preclude the injunctive
18   relief they seek and would divest this Court of
19   jurisdiction.  However, the Court is not persuaded that
20   Section 1498(b) applies.  Section 1498(b) provides:

22    [W]henever the copyright in any work . . . shall be
23   _infringed_ by the United States . . . the exclusive action
24   which may be brought for such _infringement_ shall be an
25   action by the copyright owner against the United States
26   in the Court of Federal Claims for the recovery of his

reasonable and entire compensation as damages for such <u>infringement</u>."

28 U.S.C. § 1498(b) (emphasis added.)  VARA claims are not for copyright infringement; rather, they are designed to protect the artistic and reputational rights of the artist.  <u>See</u> 17 U.S.C. § 106A(a).  These rights – also referred to as "moral rights" – afford protection "for the author's personal, non-economic interests in receiving attribution for her work, and in preserving the work in the form in which it was created, even after its sale or licensing."  <u>Leicester v. Warner Bros.</u>, 232 F.3d 1212, 1227 (9th Cir. 2000) (quoting Jane C. Ginsburg, Copyright in the 101st Congress: Commentary on the Visual Artists Rights Act and the Architectural Works Copyright Protection Act of 1990, 14 colum. Vla J.L. & Arts 477, 478 (1991)).  As such, even though VARA claims are listed in the "Copyrights" Title of the United States Code, the Court is not persuaded that they constitute claims for copyright "infringement" as contemplated by Section 1498(b).

This conclusion is supported by the text of VARA itself.  Section 106A(b), entitled "Scope and exercise of rights," explains that an artist has VARA rights "whether or not the author is the copyright owner."  17 U.S.C. § 106A(b)  It is thus clear that a VARA claim is not a

13

copyright infringement claim, as a VARA claim may be brought by someone who doesn't own the copyright.

Accordingly, the Court finds that the APA, rather than Section 1498(b), provides the applicable waiver of sovereign immunity here.  As such, Plaintiffs may seek injunctive relief as contemplated by the APA.

### b. Plaintiffs' VARA Claim

Although Plaintiffs may seek injunctive relief under VARA, their VARA claim founders on the merits.  Under the facts present here, VARA does not grant Kammeyer the right to prevent removal of the Mural.

VARA provides that "the author of a work of visual art . . . shall have the right (A) to prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his or her honor or reputation, and any intentional distortion, mutilation, or modification of that work is a violation of that right, and (B) to prevent any destruction of a work of recognized stature, and any intentional or grossly negligent destruction of that work is a violation of that right."  17 U.S.C. § 106A(a)(3).

14

Plaintiffs contend that Kammeyer is the author of the Mural (a work of visual art) and that he thus has the right to enjoin USACE's destruction of the Mural.  If the Court were to accept Plaintiffs' interpretation of VARA, Kammeyer would have the lifetime right to keep the Mural on the spillway, regardless of safety, environmental, or other important public policy concerns.[4]  Congress could not have intended this "lifelong-veto" when enacting VARA.

The First Circuit addressed this issue by concluding that VARA does not protect "site-specific" art.  Phillips v. Pembroke Real Estate, Inc., 459 F.3d 128, 134 (1st Cir. 2006).  The court explained that with site-specific art, the "location of the work is an integral element of the work," and thus "because the location of the work contributes to its meaning, site-specific art is destroyed if moved from its original site.[5]"  In summing

_____

[4] For example, imagine that the spillway had a growing crack within it that threatened its structural integrity, and it needed to be torn down immediately and rebuilt.  Plaintiffs' legal theory would mean that he, as an artist, would be able to prevent USACE from taking such steps.

[5] To be sure, the Mural may not technically be a piece of "site-specific" art.  In "site-specific" art, the artist "incorporates the environment as one of the media with which he works."  Phillips, 459 F.3d at 134. For example, a "sculpture that has a marine theme that integrates the large granite stones of [a] park with [the] sculpture and the granite sea walls of Boston Harbor" is clearly site-specific art.  See id. Nevertheless, the First Circuit's rationale behind the
(continued . . .)

up the problem of applying VARA's protections to site-specific art, the First Circuit explained:

> Once a piece of art is considered site-specific, and protected by VARA, such objects could not be altered by the property owner absent consent of the artist.  Such a conclusion could dramatically affect real property interests and laws.

Phillips, 459 F.3d at 142.  Here, applying VARA as Plaintiffs urge could present potential problems much graver than merely encumbering an owner's property interest.  The dam is a large infrastructural component whose upkeep implicates serious public safety and environmental concerns.  USACE must be allowed to operate and manage SARM and the dam in a manner that protects the public and promotes their designated function.  USACE's proposed improvements to the SARM, including raising the height of the dam, constructing protective dikes within the basin, and raising the elevation of the spillway are indisputably consistent with these objectives.

To address the "life-long veto" problem, the Court could conclude that the Mural is site-specific and thus

_____

( . . . continued)
site-specific exception to VARA is more important than whether the Mural may be classified as site-specific.

not covered by VARA's protections.  Yet, the Court finds another route more logically sound; specifically, one based on interpretation of 17 U.S.C. § 113(d)(1), another section of VARA.  Section 113(d)(1) creates an exception to VARA for a "work of visual art" installed before June 1, 1991[6] that "has been incorporated in or made part of a building in such a way that removing the work from the building will cause the destruction . . . of the work."

The question then becomes whether the term "building" covers the Prado Dam.  Plaintiffs argue that no other court examining a VARA claim has construed "building" to mean something other than a standard residential or commercial space.  (Motion at 12-13 (collecting cases).) However, Plaintiffs offer no cases that have held a large, man-made structure should not be deemed a "building" under VARA.  And the same justifications for an exception for buildings apply to a dam – changes to a functional, man-made structure may be necessary from time to time, and the structure's owner should not be permanently prevented from ever making such changes.

The above analysis assumes that the Mural could not be moved from its current location.  However, Plaintiffs assert that there is a "strong possibility" that the Mural could be moved, using a technique known as the

_____

[6] The date VARA became effective.

17

"Strappo Method."  (Declaration of Isabel Rojas-Williams, Doc. No. 20, ¶ 3.)  Plaintiffs do not present any evidence about how this process would work, or how much it would cost.  However, even if the Mural could be moved without causing its destruction, another VARA exception, 17 U.S.C. § 113(d)(2), applies.  Section 113(d)(2) explains that an owner may remove a work of visual art if the owner (1) provides written notice to the author of the owner's intention and (2) the author has not removed the work or paid for its removal within ninety days.  17 U.S.C. § 113(d)(2).  On March 5, 2015, USACE provided formal written notice to Plaintiffs' counsel of USACE's intention to remove the Mural from the dam.  (Declaration of Lawrence Minch (Doc. No. 27-7), Ex. B.)  Thus, the ninety-day window closed on June 3, 2015.

Plaintiffs, without any citations to evidence or further explanation, state that the notice did not "truly [provide] 90 days to remove the Mural" and that USACE "inserted arbitrary deadlines to present a plan."  (Reply at 12.)  The Court is not persuaded by these unsupported assertions.

In sum, the Court concludes that the Prado Dam is a "building" for the purposes of Section 113(d) and finds that USACE has complied with Section 113(d)(2)'s ninety-day notice provision applicable to removals of works of

visual art.  Accordingly, it is immaterial whether the mural can be removed.  If  removal without destruction is possible, USACE has complied with the applicable notice provisions.  If it is not, VARA's exception for works of visual art incorporated into buildings applies.  In either instance, Plaintiffs likely cannot prevail on their VARA claim.

### 2. California Arts Preservation Act

Plaintiffs also argue that they are likely to succeed on their claims under CAPA, California's analog to VARA. (Motion at 14-16.)  USACE responds that VARA preempts CAPA.  (Opp'n at 22-23.)  The real problem with Plaintiffs' argument, however, is not that CAPA is preempted, but that CAPA cannot apply to a federal agency's actions on federal land.[7]

It is well settled that the activities of federal installations are shielded by the Supremacy Clause from direct state regulation unless Congress provides "clear and unambiguous" authorization for such regulation.  <u>EPA v. State Water Resources Control Board</u>, 426 U.S. 200, 211(1976); <u>accord</u>, <u>Hancock v. Train</u>, 426 U.S. 167, 178-

---

[7] At the August 19, 2015 hearing, the Court ordered the parties to submit additional briefing on this issue. The parties did so on August 21, 2015.  (Doc. Nos. 47-48.)

179 (1976).  Consistent with this principle of immunity, the Supreme Court held in <u>Arizona v. California</u>, 283 U.S. 423 (1931) that the United States was under no obligation to submit the plans and specifications of the Boulder Dam construction project to the State of Arizona for approval.  283 U.S. at 451-52.  The Court emphasized that the United States must be free to perform its functions without conforming to the police regulations of a state. <u>Id.</u>

Here, Plaintiffs contend that USACE should be subject to California state law (CAPA), even though it is a federal agency seeking to take action on federal land. USACE hopes to remove the Mural, in part so that it may proceed with raising the height of the Prado Dam's spillway.  These facts are analogous to those in <u>United States v. State of Mont.</u>, 699 F. Supp. 835 (D. Mont. 1988).  There, the United States brought an action challenging Montana's attempt to enforce its building codes and regulations on construction projects occurring on federal military installations.  499 F. Supp. at 836-37.  The court explained that "[t]o the extent the State of Montana, by the enforcement of its building codes, is attempting to exercise authority over the plans and specifications for construction projects at federal military installations, the conflict is indistinguishable from the conflict presented in <u>Arizona v. California</u>, 283

U.S. 423, 451 (1931)."  Id. at 838.  Here, although California itself is not seeking to enforce its own authority, Plaintiffs are attempting to use state law to restrict a construction project on federal land. Accordingly, the Court finds that Arizona's holding is controlling, and that USACE's conduct likely cannot be restricted by CAPA.

As such, the Court finds that Plaintiffs have not shown serious questions exist as to their CAPA claim.

### 3. Section 106 of the National Historic Preservation Act

Finally, Plaintiffs contend that they are likely to show that USACE did not comply with its obligations under Section 106 of the National Historic Preservation Act ("NHPA").[8]  Plaintiffs bring this claim under the APA.[9]

_____

[8] As previously explained, Plaintiffs and USACE present these arguments in the supplemental briefing that the Court ordered on this issue.  (See Doc. No. 35 (July 9, 2015 Order explaining why supplemental briefing was necessary on this issue).)

[9] As previously stated, under the APA a court may overturn an agency's decision if it finds that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  The standard of review is narrow, and does not empower courts to substitute their judgment for that of the agency.  See Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989).

Section 106 of the NHPA is a "stop, look, and listen provision" that requires federal agencies to consider the effects of its programs.  See Montana Wilderness Ass'n v. Connell, 725 F.3d 988, 1005 (9th Cir. 2013).  Under the NHPA, a federal agency must make a "reasonable and good faith effort to identify historic properties; determine whether identified properties are eligible for listing on the National Register based on criteria in 36 C.F.R. § 60.4; assess the effects of the undertaking on any eligible historic properties found; determine whether the effect will be adverse; and avoid or mitigate any adverse effects."  Id.

Plaintiffs contend that USACE failed at the first step: it never made a good faith effort to identify whether the Mural was historic property before initiating the plan to remove it.

Under the NHPA, an agency must "take the steps necessary to identify historic properties within the area of potential effects" before beginning an undertaking. 36 C.F.R. § 800.4(b).  In going through the process of identifying "historical properties", an agency must "in consultation with the [State Historical Preservation Officer] . . . review existing information on historic properties within the area of potential effects, including any data concerning possible historic

properties not yet identified."  36 C.F.R. § 800.4(a)(2).
An agency is also required to "seek information, as
appropriate, from consulting parties, and other
individuals and organizations likely to have knowledge
of, or concerns with, historic properties, and identify
issues relating to the undertaking's potential effects on
historic properties."  36 C.F.R. § 800.4(a)(3).

USACE contends it fulfilled its NHPA obligations
through a series of steps it took while in the beginning
stages of the SARM Project.[10]   First, in August 1988,
USACE prepared a General Design Memorandum ("GDM").
(Supplemental Declaration of Stephen Dibble ("Dibble
Decl. II"), Doc. No. 38, ¶ 3.)  The GDM included an
Appendix that outlined the SARM Project's potential
impacts on cultural resources.  (Id. ¶ 4.)  The GDM
Appendix noted that the Prado Dam itself could
potentially be considered a historic property.  (Id.)

To evaluate the Prado Dam, as called for in the GDM
Appendix, USACE commissioned a report in October 1989.
(Id. ¶ 5.)  The report, entitled "The Prado Dam and
Reservoir, Riverside and San Bernardino Counties,
California," concluded that the Prado Dam itself (not the

---

[10] The SARM Project was designed to provide urban
flood protection to communities in Orange, Riverside, and
San Bernardino Counties.  (Dibble Decl. II ¶ 3.)  The
SARM Project recommended, among other things, raising the
Prado Dam to provide additional flood protection.  (Id.)

23

Mural, which was barely mentioned) was eligible for inclusion in the National Register of Historic Places. (Id., Ex. 3, Doc. No. 38-3 at 14.)  The report principally focuses on the history, construction, functioning, and architecture of the dam itself.  (See Doc. No. 38-3 at 1-14.)  In the fourteen pages of the report that USACE provided, the Mural receives two sentences of discussion.[11]  (Id. at 10.)

After the report was completed, USACE sent a letter to the State Historical Preservation Office ("SHPO") on March 27, 1991, advising it that USACE had concluded that the Prado Dam was eligible for listing as a historic property.  (Dibble Decl. II ¶ 6.)  USACE also drafted a Programmatic Agreement for the implementation of the SARM Project.  (Id. ¶ 7.)  After consultation with the SHPO and the American Council on Historic Preservation ("ACHP"), USACE finalized the Programmatic Agreement in April 1993.  (Id. Ex. 8, Doc. No. 38-8 at 1.).  The Programmatic Agreement was ultimately signed by USACE, the SHPO, the ACHP, Orange County, Riverside County, San Bernardino County, and two Native American representatives.  (Dibble Decl. II ¶ 11.)  As part of the

_____

[11] The report states, ". . . a large red, white, and blue logo, "200 Years of Freedom, 1776-1976," was painted on the Prado Dam spillway in 1976 by students from the Corona High School.  Easily visible from Highway 91 just south of the dam, the logo remains today one of the dam's most striking features."

Programmatic Agreement, USACE agreed that it would develop a treatment plan to address the adverse effects of the SARM Project on historic properties. (Id.)  USACE addressed the effects on the Prado Dam, which was likely going to be modified as part of the SARM Project, by completing a Historic American Engineering Record ("HAER") documentation of the Dam, which occurred in June 1996. (Id. Ex. 13, Doc. No. 38-13.)  The body of the HAER is 89 pages long. (Id.)  It principally discusses the design, construction, physical layout, and operating principles of the Prado Dam. (Id. at 2-3 (table of contents of the HAER).)  It discusses the Mural itself for two sentences – the same two sentences from the October 1989 report. (Id. at 13.)

    In 2011, USACE determined that lead paint on the Mural would hinder further work on the Prado Dam. (Dibble Decl. II ¶ 22.)  Mr. Dibble, a Senior District Archeologist with USACE, concluded that the Mural was not a historic property based solely on the 1993 Programmatic Agreement. (Dibble Decl. ¶ 8.)  Mr. Dibble also concluded that there was no basis for a new consultation to evaluate the Mural. (Dibble Decl. II ¶ 23.) Additionally, Mr. Dibble concedes that he did not consult with the SHPO as part of his NHPA evaluation. (Dibble Decl. ¶ 8 ("Based on my review of the proposal for the paint removal action, the conclusion of my evaluation was

that there were no historic properties in the [Area of Potential Effects] or surrounding the spillway, and thus no Section 106 consultation was necessary.") (emphasis added).)

There is clearly a serious question as to whether USACE's actions were sufficient under Section 106 of the NHPA.  USACE's only attempt at "evaluation" of the Mural took place in 1989 – over 27 years ago.  And the October 1989 report is deficient for two reasons.

First, the report clearly did not focus on the Mural itself; it centered on the history, functioning, and architecture of the Prado Dam.  (See Doc. No. 38-3 at 1-14.)  The report devotes two sentences to the Mural, and obviously does not evaluate the historical significance of it.  Even if this could be called an evaluation, Mr. Dibble should not have relied on those two sentences when conducting his evaluation in 2011.  The NHPA explains that an agency official may be required to reevaluate properties that were subjected to "incomplete prior evaluations."  36 C.F.R. § 800.4(c)(1).

The second reason is the report's age.  The NHPA itself recognizes that "the passage of time, changing perceptions of significance . . . may require the agency official to reevaluate properties previously determined

26

eligible or ineligible." 36 C.F.R. § 800.4(c)(1). The Mural is now approximately 40 years old – it was 13 years old at the time of the 1989 report. And there are certainly serious questions as to whether it is subject to changing perceptions of its significance. It is one of the only a handful of bicentennial murals remaining, and it is both the largest and most visible of those still existing. (Declaration of Daniel Paul, Doc. No. 15-2, ¶ 1.) Daniel Paul, an architectural historian, declares that the Mural has become one of the last public works of any kind manifestly associated with the United States Bicentennial, and that it is thus a historic physical landmark. (Id. ¶ 8.) Furthermore, the Mural has been recognized in news articles as one of the largest patriotic murals in America and has been honored by numerous local, state, and federal government officials. (See Declaration of Eric Bjorgum, Doc. No. 15-1, ¶ 2; Ex. E.). The cities of Norco, Eastvale, and Corona have passed resolutions in favor of restoring and preserving the Mural.[12] (Doc. No. 39-1, Exs. A, B; Doc. No. 43-1 ¶ 4.) Finally, the Mural is clearly a source of pride and meaning to local residents. Over 14,000 citizens have signed a petition to "Save the Prado Dam."

---

[12] Additionally, the ACHP recently weighed in and expressed concerns to USACE about the public notice it provided regarding the plans to remove the mural. (Doc. No. 39-1, Ex. C.)

(Declaration of Peter Usle ("Usle Decl.") Doc. No. 21,
Ex. B.)

In sum, there are serious questions as to whether
USACE "in consultation with the SHPO . . . review[ed]
existing information on historic properties . . .
including any data concerning possible historic
properties not yet identified" before approving the
removal of the Mural.  See 36 C.F.R. § 800.4(a)(2).
USACE was required to "seek information, as appropriate,
from consulting parties, and other individuals and
organizations likely to have knowledge of, or concerns
with, historic properties, and identify issues relating
to the undertaking's potential effects on historic
properties."  36 C.F.R. § 800.4(a)(3).  It is apparent
that they did not do so.  Thus, the Court concludes that
Plaintiffs have raised serious questions about whether
USACE's decision to remove the Mural was arbitrary or
capricious under the APA.  See Pacific Coast Fed'n of
Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv., 265
F.3d 1028, 1034 (9th Cir. 2001) (An agency decision is
inadequate where the agency "entirely failed to consider
an important aspect of the problem or failed to
"consider[] the relevant factors and articulate[] a
rational connection between the facts found and the
choice made.")

USACE also argues that, even if it didn't consult a proper evaluation, it would not matter, as the Mural "would not be eligible for inclusion in the National Register." (U. Supp. Brief at 7.)  To be sure, under the relevant guidelines, properties that are "primarily commemorative in nature" or that "have achieved significance within the past 50 years" are generally not considered eligible for inclusion in the National Register of Historic Properties.  36 C.F.R. § 60.4.  However, a commemorative property may qualify if its "design, age, tradition, or symbolic value has invested it with its own exceptional significance."  Id.  And if a property is less than 50 years old, it may be designated a historic property if it is of "exceptional importance." Id.  Given the groundswell of public support and renewed historical interest in the Mural, the Court concludes that there is a serious question as to whether the Mural meets one of these exceptions.  Furthermore, USACE cannot sidestep its duties under the NHPA by putting forth belated and self-serving speculation about what a proper Section 106 evaluation would reveal.

In light of the above, the Court finds that there are serious questions as to whether Plaintiffs will prevail on their APA claim that USACE did not properly evaluate the Mural under Section 106 of the NHPA.

29

1

2

### c. The Public Interest

3

4     Finally, the Court finds that Plaintiffs have shown

5 that an injunction here would be in the public interest.

6 Plaintiffs have presented thousands of signatures and

7 comments attesting to the Mural's value to the community;

8 community members note the sense of civic pride and

9 patriotic appreciation the Mural engenders. (See Usle

10 Decl., Exs. A, B.) Furthermore, local governments have

11 begun to come forward to express their support for

12 preserving the Mural. (See Doc. No. 39-1, Exs. A, B;

13 Doc. No. 43-1 ¶ 4 (resolutions by Cities of Norco,

14 Eastvale, and Corona).) Additionally, California law

15 makes clear that there is "a public interest in

16 preserving the integrity of cultural and artistic

17 creations." Cal. Civ. Code § 987(a).

18     Accordingly, the Court finds Plaintiffs have shown

19 that an injunction would be in the public's interest.

20

21                    **IV. CONCLUSION**

22

23     The Court finds that Plaintiffs have shown an

24 immediate threat of irreparable harm and that the balance

25 of equities tips sharply in their favor. The Court also

26 finds that Plaintiffs have shown serious questions exist

27 as to their NHPA cause of action brought under the APA.

28

Finally, the Court finds that an injunction would serve the public interest.  The Court therefore GRANTS Plaintiffs' Motion, and ORDERS as follows:

- USACE or their agents, servants, employees, attorneys, or any other persons in active concert or participation with USACE, shall not take any action that could alter, desecrate, destroy or modify in any way the painted mural known as the "200 Years of Freedom Mural" painted on the spillway of the Prado Dam in Corona, California until this matter is fully adjudicated.

- The Court shall retain the nominal bond of five hundred dollars ($500) Plaintiffs' posted June 11, 2015, as security for the preliminary injunction.

**IT IS SO ORDERED.**

Dated:  <u>August 24, 2015</u>            _____

                                       Jesus G. Bernal
                          United States District Judge